ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRADER PUBLISHING
COMPANY, a Virginia general
partnership,

        Plaintiff,

vs.

THOMAS V. LONGROY, an
individual, and THE HERALD
COMPANY, INC, a foreign
corporation, d/b/a THE ANN
ARBOR NEWS,

        Defendants.

MAGISTRATE JUDGE SCHEER

Case No.
Hon.
Magistrate GERALD E. ROSEN

02CV73204DT

---

WILLIAMS MULLEN
By: Mark V. Heusel (P47528)
Attorney for Plaintiff
300 North Fifth Avenue
Ste. 230
Ann Arbor, Michigan 48104
734-213-2700

### VERIFIED COMPLAINT

Plaintiff, Trader Publishing Company, by its attorneys, Williams Mullen, states for its Verified Complaint against Thomas Longroy and The Herald Company, d/b/a The Ann Arbor News, as follows:

### THE PARTIES

1. Plaintiff, Trader Publishing Company ("**Plaintiff**") is a Virginia general partnership, which has its principal place of business in Norfolk, Virginia, and which conducts business and maintains offices within southeastern Michigan.

2. Defendant, Thomas V. Longroy ("**Longroy**") is an individual residing in the County of Oakland, State of Michigan.

FILED AUG -6 PM 12:44

1

3.      Defendant, The Herald Company, Inc. is a New York corporation, doing business as The Ann Arbor News (the "News"). The News conducts business and maintains its principal place of business in the City of Ann Arbor, Michigan.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper pursuant to 28 U.S.C. §1332(a)(1) because the amount in controversy (and/or the value of the rights Plaintiff seeks to protect) in this action exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of costs, interest, and attorneys' fees and there is diversity of citizenship between the parties.

5.      Venue is proper pursuant to §1391(a)(1) & (2) because the Defendants reside and conduct business within the Eastern District of Michigan and the events giving rise to the claims occurred in the Eastern District of Michigan.

## GENERAL ALLEGATIONS

6.      Plaintiff is a national leader in the publishing of photo advertising, classified advertising, and special interest magazines and newspapers.

7.      One of the many publications distributed by Plaintiff is the *Auto Trader*, which can be obtained throughout southeastern Michigan, including the Ann Arbor area.

8.      The *Auto Trader* is a weekly publication that displays classified advertising for cars, light duty trucks and sport utility vehicles.

9.      Plaintiff employs regional sales representatives to sell classified advertising space for the *Auto Trader* to dealers, such as Briarwood Ford, Varsity Ford and Fischer Honda.

10.     The *Auto Trader* is made available to the general public in grocery stores and other retail outlets throughout southeastern Michigan.

11. Plaintiff employed Longroy as a Sales Representative from June 5, 2000 through June 11, 2002.

12. As a Sales Representative, Longroy was assigned a territory, which included Washtenaw County and specifically assigned accounts in neighboring counties (the "**Territory**").

13. As part of Longroy's duties, he was expected to call on car dealers in the Territory for the purpose of selling classified advertising space in the *Auto Trader*.

14. While employed by Plaintiff, Longroy was assigned and actively sold classified advertising to franchise, specialty and independent dealers in the Territory, including, but not limited to, Varsity Ford, Briarwood Ford, Ann Arbor Subaru and Fischer Honda.

15. Longroy was also responsible for selling classified advertising for other publications of Plaintiff, including, *Truck Trader, Boat, Bike and RV Trader* and *Cycle Trader*.

16. Longroy was paid on a straight commission basis, equivalent to 15% of weekly revenue generated from sales he made for advertising space in these publications. In addition, Longroy was entitled to receive bonuses based on exceeding monthly revenue goals.

17. In consideration for Longroy's employment with Plaintiff, Longroy agreed to the terms of and executed Plaintiff's Proprietary Information Protection Agreement on June 1, 2000 (the "**Agreement**") (Exhibit 1).

18. The Agreement, in relevant part, specifically provides:

VII. **NON-SOLICITITATION OF CLIENTS**

**During the course of his or her employment with the Company, Employee will acquire knowledge of Confidential Information relating to the Company's Clients. The Company considers the identity of its**

WILLIAMS MULLEN • DETROIT • ANN ARBOR • BLOOMFIELD HILLS • VIRGINIA • WASHINGTON, D.C.

Clients, the contact person of said Client, and/or the financial information related to business conducted between said Client and the Company to be Trade Secrets of the Company.

To ensure the protection of the Company's proprietary interest in such information, as well as its protectable business interests, it is agreed that Employee will not, without the express written consent of either the Chief Executive Officer of the Company or his/her designee, <u>during his/her employment and for one (1) year immediately following termination of Employee's employment with the Company for any reason</u>, either directly or indirectly, call upon, solicit, divert or take away, or attempt to solicit, divert or take away, for the purpose of selling, transferring, or licensing a product or service provided by or in development by the Company, any Clients, business or patrons of the Company upon whom Employee called or whom Employee serviced or solicited or with whom Employee became acquainted as a result of employment with the Company.

(Exhibit 1, p. 4).

19.  "Client" is defined in the Agreement to mean "any person or entity with whom the Company conducts business or from whom the Company or Employee obtains information including, but not limited to, customers or suppliers." (Exhibit 1, p. 3).

20.  "Trade Secret" is further defined by the Agreement "as the whole or any part or phase of any client list or related client information, internal training publications (whether copyrighted or not), training methodologies, marketing strategies, financial data, design, process, procedure, formula, improvement, or invention, which (a) is known to the Company, (b) the Company considers confidential, and (c) gives one who uses it an advantage over competitors who do not know of or use it" (Exhibit 1, p. 2).

21.  The Agreement also protects Plaintiff's "Confidential Information," which includes Trade Secrets and "non-Trade Secret proprietary data including sales records; invoices; information contained in client files and information provided by clients

pertaining to those clients; financial information, data or statements; circulation and distribution data; the existence and contents of agreements . . ." (Exhibit 1, p. 2).

22.  The Agreement specifically prohibits Employees from disclosing Confidential Information to third parties:

### IV.  NON-DISCLOSURE OF CONFIDENTIAL INFORMATION

Employee acknowledges that Confidential Information is a valuable and unique asset of the Company or third parties who have furnished it to the Company. Employee understands that Confidential Information will only be made known to Employee in confidence in connection with his or her job duties. Employee agrees that disclosure or use of Confidential Information by Employee other than for the sole benefit of the Company is wrongful and would cause irreparable harm to the Company. If Employee is in doubt as to whether certain information is Confidential Information, Employee will treat such information as Confidential Information.

Employee acknowledges that Employee will not disclose or use Confidential Information for any purpose other than in the performance of his or her duties for the Company. This obligation extends during the entire term of Employee's employment with the Company and after the date of termination of that employment.

Employee agrees that Employee will use all reasonable measures to prevent the unauthorized use of Confidential Information by others. These measures include strict compliance with all procedures developed by the Company to protect such information.

### VI.  OWNERSHIP OF CONFIDENTIAL INFORMATION: RETURN OF MATERIALS

Employee agrees that all Confidential Information, including that which is produced by the Company, all materials embodying Confidential Information, and all copies thereof, will remain the property of the Company or of the third party who has furnished it to the Company. At the termination of Employee's at-will employment with the Company or at the request of the Company at any time, Employee will immediately deliver to the Company all materials, and copies thereof, that are in Employee's possession or control and that contain or are related in any way to any Confidential Information (Exhibit 1, p. 3-4).

23.  The Agreement further provides:

### VIII.  COVENANT NOT TO COMPETE

5

In furtherance of the Company's protection of its Trade Secrets and other protectable interests, Employee agrees that <u>during his/her employment and for one (1) year immediately following termination of Employee's employment with the Company for any reason</u>, Employee will not, without first obtaining the express written consent of either the Chief Executive Officer of the Company or his/her designee, render services, engage in, enter the employment of, or act as an advisor or consultant to any person, firm or corporation engaged in or about to become engaged in the manufacture or sale of any product or service substantially similar to or competitive with any product or service on which or with which Employee worked or about which Employee obtained information during the last twelve (12) months of his/her employment with the Company ("Restricted Competitor").

For purposes of this Agreement, a Restricted Competitor shall be further defined as operating within the geographical areas in which Employee provided services for the Company and/or the geographical area in which Client representatives operate with whom Employee had business contact during the last twelve (12) months of his/her employment.

(Exhibit 1, pp. 4-5).

24. The Agreement also provides the remedies available to Plaintiff if Longroy breaches these covenants:

XI. **COMPANY'S REMEDIES**

Employee acknowledges that his or her obligations under this Agreement are special, unique and extraordinary and that any breach thereof will cause irreparable injury to the Company not properly compensable by damages in an action at law; therefore, the rights and remedies of the Company hereunder may be enforced both at law or in equity, by injunction or otherwise.

Employee further agrees, if the Company prevails in any suit or proceeding to enforce its rights under this Agreement, to indemnify the Company for all expenses of every nature and character incurred by the Company including, without limitation, all reasonable attorneys' fees.

(Exhibit 1, p. 5).

25. The dealers in Longroy's Territory for whom he sold classified advertising to are Clients as defined by the Agreement.

6

26. During Longroy's employment with Plaintiff, Longroy became familiar with Plaintiff's Clients in the Territory (i.e., Client Lists), the contact person/s of said Clients and the financial information related to business conducted between said Clients and Plaintiff (hereinafter "**Trade Secrets**").

27. This information was provided to Longroy on a weekly basis through Account Activity Reports and Customer History Reports.

28. Plaintiff treated these Trade Secrets as confidential and proprietary information of Plaintiff.

29. A critical component of Plaintiff's continued success is its relationships with it Clients. Plaintiff has expended significant resources to service its Clients in the Territory, including the provision of local staff, equipment, supplies and convenient local offices.

30. Plaintiff also spends substantial resources in terms of time, effort and money to train its employees. Sales Representatives are provided customized training, prospect lists, assigned accounts, historical revenue information of Clients and market data, which allows them to effectively compete for classified advertising revenue.

31. Plaintiff's Client Lists and other Trade Secrets are not available from other sources and have been created and updated by Plaintiff over a period of years of relationship building with its Clients.

32. Plaintiff has instituted safeguards to protect its Trade Secrets, such as requiring Sales Representatives to: (i) sign contractual agreements like the Agreement attached hereto; and (ii) adhere to other company confidentiality policies.

33. Plaintiff's employees are instructed to maintain Plaintiff's Trade Secrets as confidential, and all employees are specifically prohibited from disclosing Client information or using such information for their own benefit or the benefit of others, and employees are contractually required to return all Trade Secrets to Plaintiff upon their termination.

7

34. Longroy voluntarily resigned from his position with Plaintiff on June 11, 2002.

35. Longroy informed Plaintiff's Sales Manager that he was returning to his previous employment with Park West Galleries; a position that was not competitive to his employment with *Auto Trader*.

36. In July 2002, Plaintiff became aware that Longroy had accepted a sales position with the News selling classified advertised for *the Auto Source*.

37. The *Auto Source* is a competitive publication to the *Auto Trader*, in that it is a weekly publication, which displays classified advertising for car dealers (*see* Exhibit 2).

38. Like Plaintiff's *Auto Trader*, the News' *Auto Source* is distributed in grocery stores and other retail outlets in the Territory.

39. The *Auto Trader* and the *Auto Source* compete with each other to sell classified advertising space to dealers and other individuals in the Territory.

40. Plaintiff has recently discovered that Longroy, in his capacity as a sales representative for the News, has solicited Plaintiff's Clients for the purpose of selling classified advertising space in the *Auto Source*.

41. In fact, Plaintiff is aware that Longroy, in his capacity as a sales representative for the News, has solicited as follows:

A. Longroy has personally solicited Ann Arbor Subaru's manager to sell classified advertising in the *Auto Source*;

B. Varsity Ford's New Car Sales Manager informed Plaintiff's Sales Manager that it had been solicited by Longroy and consequently decided to run its classified advertising in the *Auto Source*, instead of the *Auto Trader*;

C. The *Auto Source* publication identifies Longroy as the point of contact for business owners wishing to purchase advertising in the *Auto Source*; and

D.  Plaintiff has identified several accounts, including, Varsity Ford, Briarwood Ford and Fischer Honda, which have discontinued or diminished advertising in the *Auto Trader* and, instead, are advertising in the *Auto Source*.

42.  By accepting employment with the News to sell classified advertising for the News' *Auto Source* to dealers in the Territory, Plaintiff has breached Section VIII of the Agreement prohibiting Longroy from accepting employment with a competitor within 1 year after voluntarily resigning from Plaintiff.

43.  Longroy's solicitation of Plaintiff's Clients, as described in paragraph 41 of the Complaint, is also a breach of Section VII of the Agreement, which prohibits Longroy from either directly or indirectly, calling upon, soliciting, diverting or taking away, or attempting to solicit, divert or take away, a Client of Plaintiff or business of Plaintiff.

44.  On July 8, 2002, Plaintiff, through counsel, notified Longroy and the News that it believed Longroy was in breach of the Agreement because of his improper employment with a competitor and the illegal solicitation of Plaintiff's Clients (Exhibit 3).

45.  In response, the News, through counsel, informed Plaintiff that it would "not be terminating Mr. Longroy's employment" (Exhibit 4).

46.  Upon information and belief, Longroy has obtained counsel but neither Longroy nor his attorney has articulated a position.

47.  Upon information and belief, Longroy continues to breach the terms of his Agreement with Plaintiff by soliciting Plaintiff's Clients through his employment with the News (*see* Exhibit 2).

## COUNT I – BREACH OF CONTRACT (Longroy)

48.  Plaintiff realleges and incorporates by reference each and every paragraph previously set forth.

49. In consideration for Longroy's employment with Plaintiff, Longroy executed an Agreement, which, for a period of 1 year from the date of his resignation, specifically restricts Longroy from: (i) accepting employment with a competitor in the same geographical area that he provided services to Clients on behalf of Plaintiff; and (ii) either directly or indirectly, calling upon, soliciting, diverting or taking away, or attempting to solicit, divert or take away any Client, business or patron of Plaintiff.

50. The Agreement also specifically prohibits Longroy from disclosing Plaintiff's Trade Secrets, including, but not limited to, Client Lists, Client contacts and Client financial information.

51. Within 1 month of voluntarily resigning from his position as a Sales Representative with Plaintiff, Longroy accepted a sales position with the News selling classified advertising for the *Auto Source*.

52. The *Auto Source* is a direct competitor to Plaintiff's *Auto Trader* publication because both publications cover the Territory and target dealers and others who desire to place classified advertising for the sale of cars, light duty trucks and sport utility vehicles.

54. By accepting employment as a sales person for the News' *Auto Source*, Longroy has breached Section VIII of his Agreement with Plaintiff, in that:

A. Longroy accepted the position within 1 year of his voluntary resignation from Plaintiff;

B. Longroy did not obtain written consent from Plaintiff to accept a sales position with a competitor;

C. The *Auto Source* is a direct competitor to Plaintiff's *Auto Trader*; and

D. Longroy's position with the News' *Auto Trader* operates in the same geographical area where Longroy provided services for Plaintiff and where Plaintiff's Client representatives operate.

10

55.     Longroy has further breached Section VII of the Agreement by calling upon, soliciting and diverting away Plaintiff's Clients and business as described in paragraph 41.

56.     Upon information and belief, Longroy has also breached Sections IV and VI of the Agreement by: (i) misappropriating Plaintiff's Client Lists and using this information in his position with the News to compete with Plaintiff; and (ii) misappropriating Plaintiff's Clients' financial information, including, but not limited to, Account Activity Reports and Customer History Reports.

57.     In contrast, Plaintiff has fully performed all of its obligations and conditions under the Agreement.

58.     By virtue of Longroy's breaches of his contractual duties, Plaintiff is, and continues to be, irreparably harmed in an amount that cannot readily be ascertained or compensated by money damages.

59.     Longroy has acknowledged that breaches of the Agreement, such as those described herein, are "special, unique and extraordinary and that [they] will cause irreparable injury to [Plaintiff] not properly compensable by damages in an action at law; therefore, the rights and remedies of the [Plaintiff] hereunder may be enforced both at law or in equity, by injunction or otherwise" (Exhibit 1, p. 5, Section 11).

60.     Unless Longroy is enjoined from further breaches of his contractual duties, Plaintiff will continue to suffer irreparable injury.

61.     Longroy's ongoing breaches of his Agreement constitute transgressions of a continuing nature, for which Plaintiff has no adequate remedy at law.

### COUNT II – BREACH OF FIDUCIARY DUTY (Longroy)

62.     Plaintiff realleges and incorporates by reference each and every paragraph previously set forth.

11

63. Upon information and belief, prior to resigning from Plaintiff, Longroy engaged in a course of conduct inconsistent with his common law fiduciary obligations and duties of loyalty to protect the interests of Plaintiff and to refrain from doing anything that would work to injure Plaintiff.

64. Upon information and belief, Longroy, while still employed by Plaintiff, either instructed or encouraged Plaintiff's Clients to delay purchasing classified advertising in the *Auto Trader* so that Longroy could sell the advertising for the *Auto Source* after he began employment with the News.

65. Upon information and belief, Longroy misappropriated Plaintiff's Trade Secrets by using the information to illegally compete with and injure Plaintiff.

66. By virtue of the foregoing improper conduct by Longroy, Plaintiff is, and continues to be irreparably harmed.

67. Longroy's breaches of his fiduciary duty constitute transgressions of a continuing nature, for which Plaintiff has no adequate remedy at law.

### COUNT III – MISAPPROPRIATION OF TRADE SECRETS
(Longroy and News)

68. Plaintiff realleges and incorporates by reference each and every paragraph previously set forth.

69. Plaintiff cares for its Client Lists, Client contacts and Client financial information (i.e., historical sales activity and revenue volume) in a confidential manner and these Trade Secrets are sufficiently secret that they have economic value.

70. Plaintiff makes great efforts at substantial costs to maintain the confidentiality of these Trade Secrets by enforcing contractual obligations of its employees, implementing company policies and securing access to such Trade Secrets.

71. Upon information and belief, Longroy has misappropriated Plaintiff's Trade Secrets and used this information to unfairly compete with Plaintiff and solicit Plaintiff's Clients.

72. Because of Longroy's actions, Plaintiff has been, and continues to be, irreparably harmed for which there is no adequate remedy at law.

### COUNT IV – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS (Longroy and News)

73. Plaintiff realleges and incorporates by reference each and every paragraph previously set forth.

74. Plaintiff enjoyed continuing business relationships with numerous Clients in the Territory.

75. Longroy had knowledge of these Clients and through misappropriation made this information known to the News.

76. Longroy and the News used this misappropriated information to intentionally interfere with Plaintiff's relationships with its Clients.

77. Longroy and the News have induced or caused, and will continue to induce or cause, Clients of Plaintiff to terminate their business relationships with Plaintiff.

78. By virtue of Longroy's and the News' tortious interference with Plaintiff's business relationships, Plaintiff is, and continues to be, irreparably harmed.

79. Longroy's and the News' ongoing acts of tortious interference constitute transgressions of a continuing nature, for which Plaintiff has no adequate remedy at law.

### COUNT V – TORTIOUS INTERFERENCE WITH THE AGREEMENT (News)

80. Plaintiff realleges and incorporates by reference each and every paragraph previously set forth.

81. Plaintiff has a continuing Agreement with Longroy, which (i) prohibits his employment as a sales person with the News' *Auto Source;* and (ii) prohibits Longroy from calling upon or soliciting Plaintiff's Clients.

82. Plaintiff provided the News notice that such an Agreement existed between Plaintiff and Longroy.

83. The News acknowledged the existence, terms and conditions of the Agreement between Plaintiff and Longroy.

84. Despite acknowledging that Plaintiff was prohibited from working as a sales person for the *Auto Source*, the News has refused to terminate Longroy's employment.

85. Such refusal by the News is an intentional and improper interference of the Agreement between Plaintiff and Longroy, in that it induces or causes a breach, disruption, or termination of the Agreement.

86. By virtue of the News' tortious interference with the Agreement, Plaintiff is, and continues to be, irreparably harmed.

87. The News' ongoing acts of tortious interference constitute transgressions of a continuing nature, for which Plaintiff has no adequate remedy at law.

### RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant the following relief:

A. Issue a temporary restraining order, preliminary and permanent injunction enjoining and restraining Defendant Longroy, his agents, servants, and attorneys and any person and/or entity acting on behalf of or in concert with them who receive actual notice of the order by personal service or otherwise, from continuing to be employed by, rendering services for, or acting as an advisor or consultant to Defendant News for the purpose of selling, soliciting, offering or servicing classified advertising for the *Auto Source* or any other

division of Defendant News that is competitive to any services Defendant Longroy provided for Plaintiff;

  B. Issue a temporary restraining order, preliminary and permanent injunction enjoining and restraining Defendant Longroy, his agents, servants, and attorneys and any person and/or entity acting on behalf of or in concert with them who receive actual notice of the order by personal service or otherwise, from either directly or indirectly, calling upon, soliciting, diverting or taking away, or attempting to solicit, divert or take away any client, business or patron of Plaintiff for whom Longroy provided services or became acquainted with as a result of his employment with Plaintiff;

  C. Issue a temporary restraining order, preliminary and permanent injunction enjoining and restraining Defendant Longroy, his agents, servants, and attorneys and any person and/or entity acting on behalf of or in concert with them who receive actual notice of the order by personal service or otherwise, from copying, disclosing, transmitting, reviewing, using, distributing, discussing, transferring, commenting or relying on Plaintiff's Trade Secrets, including, but not limited to, Client Lists, Client contacts, Client financial information, Account Activity Reports, Customer History Reports, Plaintiff's financial information, Plaintiff's market data, Plaintiff's revenue or any other documents, materials or information that discuss, reference, summarize, identify or relate, directly or indirectly, to the records of Plaintiff or Plaintiff's Clients, including any and all information contained on software or copies, (collectively referred to as "Trade Secrets"), and further direct that such Trade Secrets be returned to Plaintiff immediately.

  D. Issue a temporary restraining order, preliminary and permanent injunction enjoining and restraining Defendant News, its officers, agents, servants, employees, and attorneys and any person and/or entity acting on behalf of or in concert with them who receive actual notice of the order by personal service or otherwise, from employing,

15

accepting the services of, or contracting with, Defendant Longroy for the purpose of selling, soliciting, offering or servicing classified advertising for the *Auto Source* or any other division of Defendant News that is competitive to any services Defendant Longroy provided for Plaintiff;

E.  Issue a temporary restraining order, preliminary and permanent injunction compelling Defendants Longroy and the News, their officers, agents, servants, employees, and attorneys and any person and/or entity acting on behalf of or in concert with them who receive actual notice of the order by personal service or otherwise, to return to Plaintiff any and all records, copies and derivatives of this information referred to in Sections II, IV, V and VI of the Agreement, which have been removed from Plaintiff;

F.  Enter an award in favor of Plaintiff and against Longroy and the News for the costs of this action, including, but not limited to, reasonable attorneys' fees and costs;

G.  Any other relief deemed appropriate by this Court.

Respectfully Submitted,

Williams Mullen

By: _____
Mark V. Heusel (P47528)
300 North Avenue, Ste. 230
Ann Arbor, Michigan 48104
(734) 213-2700

Dated: August 5, 2002

## VERIFICATION

STATE OF MICHIGAN  }
                   } ss.
COUNTY OF Wayne    }

KEVIN MCMANAWAY, being duly sworn, deposes and says that: he is the General Manager of Trader Publishing in that capacity, he has personal knowledge of all facts set forth in the foregoing Verified Complaint, knows the allegations contained therein to be true to the best of his knowledge, information and belief and, if called upon, could competently testify to those facts.

_____
Kevin McManaway

Subscribed and sworn to before me
on this 5 day of August, 2002.

_____
Notary Public
Wayne County, Michigan
My Commission Expires: 7-3-05

MARIA ESTEP
Notary Public, Wayne County, MI
Acting in Oakland Co., MI
My Commission Expires 07/03/2005

L:\J6\351400\pld\complaint.doc

17

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED